**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| IN RE PRIORITY RESPONSIBLE FUNDING LLC | ) Consolidated<br>) C.A. No. 2024-0651-NAC |

**POST-TRIAL MEMORANDUM OPINION**

Date Submitted: June 5, 2025
Date Decided: March 10, 2026

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, DE; Dion G. Rassias, THE BEASLEY FIRM LLC, Philadelphia, PA; John J. Uustal, Cristina M. Pierson, KELLEY | UUSTAL, PLC, Fort Lauderdale, FL; *Attorneys for Plaintiffs Priority Pre-Settlement Funding, LLC and Brett K. Findler.*

Geoffrey G. Grivner, Kody M. Sparks, BUCHANAN, INGERSOLL & ROONEY P.C., Wilmington, DE; Stuart P. Slotnick, BUCHANAN, INGERSOLL & ROONEY P.C., New York, NY; *Attorneys for Gard Family Office, LLC, PRF Fund I, LP, PRF Fund II, LP, and GFO Asset Management LLC.*

**COOK, V.C.**

This consolidated action concerns a Delaware limited liability company, Priority Responsible Funding, LLC ("PRF"), with two co-managing members, Priority Pre-Settlement Funding LLC ("PPSF") and Gard Family Office, LLC ("GFO"). When functioning, PRF operated in the litigation finance space, most recently acting as an originator and servicer for funding opportunities. GFO seeks PRF's dissolution and winding up, asserting the managing members are insurmountably deadlocked. PPSF alleges GFO (1) violated fiduciary duties owed to PRF and its members, (2) breached PRF's operating agreement, and (3) tortiously interfered with the business of PPSF's founder and controller, Brett Findler.

For the reasons explained below, the Court finds that PRF is deadlocked, essentially non-operative due to its managing members' dysfunctional relationship, and unable to carry out its business purpose. Accordingly, the Court holds PRF should be wound-up and dissolved. The Court also concludes that PPSF has not shown by a preponderance of the post-trial evidence that GFO breached fiduciary duties, violated PRF's operating agreement, or tortiously interfered with Brett's business.[1] Instead, the evidence shows PRF's operating agreement permitted the challenged actions, which were the product of repeated, informed consent between the parties. Therefore, the Court enters judgment in GFO's favor on its dissolution and winding up claims and against PPSF and Brett on each of their claims.

---

[1] Because Brett Findler's brother, Lloyd Findler, is a relevant non-party in this litigation, the Court refers to each using their first names. No familiarity or disrespect is intended.

# I.    FACTUAL BACKGROUND

## A.    Brett Findler Forms PPSF and Meets Casey Gard

Brett is an attorney who developed relationships with numerous personal injury lawyers over his 35 years of practice.[2]  Through his practice, Brett recognized a growing need for litigation funding and believed he could leverage his preexisting relationships to launch a successful company in that market.[3]  In mid-2018, Brett founded PPSF using his own funds and a limited investment from a third-party, Alfreda Vila Santander.[4]  Initially, PPSF provided non-recourse litigation funding to lawyers for their clients' medical care and other litigation expenses.[5]  If a case resulted in a monetary award or settlement, PPSF profited by collecting the amount funded plus interest.[6]

Around the time Brett founded PPSF, he met Casey Gard in connection with an unrelated real estate transaction.[7]  Gard is GFO's Managing Member.[8]  Prior to

---

[2] *See* Tr. 5:1-23, 10:6-12.  Unless otherwise noted, the parties stipulated to the following facts or proved them by a preponderance of the evidence at trial.  To the extent that the parties presented conflicting evidence, the Court has weighed it and made findings of fact accordingly.  Citations to "Dkt." refer to the docket in this matter.  Citations to "Tr." refer to the Trial Transcript in this matter.  *See* Dkt. 87; Dkt. 88; Dkt. 89.  Citations to "PTO" refer to the Joint Phase I Pre-Trial Order.  *See* Dkt. 75.

[3] *See* Tr. 14:4-16:11, 20:18-21:20.

[4] PTO ¶ 3; Tr. 19:5-20:17, 21:21-22:4.

[5] Tr. 16:8-11.  In the litigation finance space, "non-recourse" means the "funding company [is] put in the same position as the plaintiff's lawyer" such that "if there's no recovery, there's no recourse" by "the funding company to get the money.  So the funding company loses their principal and any expected interest." *Id.* at 16:12-17:1.

[6] *See id.* 17:2-16; JX14.

[7] *See* Tr. 26:18-28:24, 513:7-19.

[8] *See id.* 511:17-23.  GFO is a single-family investment firm—*i.e.*, a family office. *Id.*

meeting Brett, Gard founded and managed a successful hedge fund.[9] Brett and Gard hit it off and began spending time together socially.[10] This often included taking long walks on Miami Beach where the pair would discuss their lives.[11] On these walks, Brett educated Gard about the litigation funding business.[12] In turn, Gard taught Brett about hedge funds, including how they operate and generate fees.[13]

Brett pitched Gard on a potential investment in PPSF, explaining how additional capital could allow national expansion.[14] Although Gard lacked experience with litigation funding,[15] he expressed interest in the opportunity.[16] Gard mentioned how he could use his previous experience and connections to potentially create a new hedge fund in the future to raise third-party capital.[17] The pair discussed a business plan where Brett would leverage his attorney contacts to drum

---

[9] *See id.* 29:7-10, 511:12-15, 512:2-17.

[10] *See id.* 514:2-7 ("we had developed some rapport, started spending a bit of time together.").

[11] *See, e.g.*, 35:22-37:5 ("[W]e got along famously.").

[12] *See id.* 31:8-32:24, 514:8-515:14.

[13] *See id.* 34:24-35:21, 318:10-319:2; JX15 ("I so enjoyed teaching you the legal aspects of our business and equally enjoy your educating me about Hedge Fund participation etc!"). Instead of using more common nomenclature like two and twenty, Brett testified that he learned about an "80/20 rule." Tr. 35:12-21 ("Basically what he explained to me was like an 80/20 rule . . . the hedge fund would get a 20 percent or more performance fee . . . [a]nd that's how hedge funds would make their money.").

[14] *See* Tr. 37:6-19, 514:8-515:20.

[15] PTO ¶ 17.

[16] *See* Tr. 515:1-5.

[17] *See id.* 37:20-39:10, 42:23-43:8, 203:12-23.

4

up business and GFO would provide capital at Gard's discretion for fundings and expenses.[18] Soon thereafter, in late 2018, Gard began investing in PPSF's fundings.[19]

## B.    Findler and Gard Form PRF.

In early January 2019, Brett and Gard formed PRF, executing the entity's Limited Liability Company Agreement ("PRF LLC Agreement") on behalf of PPSF and GFO, with each of the members owning a 50% ownership interest in PRF.[20] Several provisions of the PRF LLC Agreement are relevant to this dispute.

Section 2.1(a) identifies GFO and PPSF as PRF's "Managing Members."[21]  Per Section 2.1(a), "[m]anagement and control of [PRF] shall be vested exclusively in the Managing Members" and the "business and affairs of [PRF] shall be managed under the direction of the Managing Member."[22]  Further, the Managing Members "shall act by unanimous vote" unless specified otherwise in the PRF LLC Agreement or a "written action adopted by the Managing Members."[23]  Section 2.1(a) also empowers the Managing Members to "act through written consents" and bind PRF.[24]

---

[18] *See id.* 39:11-42:22.

[19] *See id.* 515:15-516:2.

[20] PTO ¶¶ 4, 7; *see* JX18 ("PRF LLC Agreement").  The PRF LLC Agreement defines PRF as the "Company"; PPSF as "Priority"; and GFO as "Gard"; it also identifies PPSF and GFO as "Managing Members."  PRF LLC Agreement at 1.

[21] PRF LLC Agreement § 2.1(a).  Section 2.1(b) identifies PRF's initial officers—Brett as President; Gard as Executive Chairman; and Becky Prieto as Treasurer and Controller. *Id.* § 2.1(b).

[22] *Id.*

[23] *Id.*  The unanimity requirement includes the removal and replacement of Managing Members. PTO ¶ 11.

[24] PRF LLC Agreement § 2.1(a).  Moreover, "any person dealing with [PRF] shall be entitled to rely upon a Managing Member's authority to act without further inquiry." *Id.*

The PRF LLC Agreement details the company's business and management.[25] Section 1.3 provides that PRF's business purpose is to:

> engage in any lawful business permitted under the Act . . . . By way of example, and not by way of limitation . . . the initial business plan of [PRF] involves deploying [PRF's] capital as investments in (i) non-recourse investments, including non-recourse fundings, extended to third parties . . . and (ii) recourse loans extended to third parties[.][26]

In establishing PRF, the PRF LLC Agreement provided for the transfer of PPSF's prior case fundings, including those in which Gard had invested, to PRF in connection with the members' initial capital contributions.[27]

The PRF LLC Agreement details how funds would flow between PRF and its members.[28] Section 3.2 provides that, "[o]ther than the initial capital contribution of the Members . . . no Member shall be obligated to make any additional contribution to [PRF's] capital, except as may be consented to by all the Members." [29] Notwithstanding the foregoing, the PRF LLC Agreement notes that "Gard expects to contribute, as needed from time to time, capital to be utilized for [PRF] operations[,]"

---

[25] *See id.* Art. I-II.

[26] *Id.* § 1.3. Despite their role leading PRF, "[t]he Managing Members shall not be entitled to receive a salary . . . unless and except as the Managing Members shall agree." *Id.* § 2.1(a).

[27] PTO ¶ 5; PRF LLC Agreement, Schedule A.

[28] *See* PRF LLC Agreement Art. III.

[29] *Id.* § 3.2; s*ee id.* at Schedule A. *See also id.* § 3.7 ("In no event shall the Members (or a former Member) be obligated to make any additional contribution whatsoever to [PRF], or have any liability for the repayment and discharge of the debts and obligations of [PRF] (apart from such Member's interest in [PRF]), except that the Members (or a former Member) may be required to make contributions to [PRF] to the extent required by the Act.").

which Section 3.2 defines as "Operations Capital."[30]  The PRF LLC Agreement

further provides:

> [s]ubject to approval by the Managing Members of each Non-Recourse
> Funding, Recourse Loan, or other investment to be made by [PRF] (any
> of the foregoing so approved by the Managing Members, an
> "Investment"), Gard expects to contribute the capital to be utilized by
> [PRF] for each such approved Investment ("Investment Capital").[31]

The PRF LLC Agreement also set forth PRF's obligation to make

"Distributions" to its Members.[32]  Generally, "[d]istributions . . . shall be made from

[PRF] to the Members at such times as the Managing Members may determine[.]"[33]

Regarding "Distributions Related to Investment Capital" specifically, Sections

3.5(b)(ii)(A) and 3.5(b)(ii)(B) address distributions related to fundings for which the

members themselves contributed Investment Capital.[34]  Conversely, Section

3.5(b)(ii)(C), addresses the allocation of distributions for fundings involving any third-

party Investment.[35]  Specifically,

> [d]istributions related to any Investment as to which the capital for such
> investment is sourced entirely from a third party (any such Investment
> a "Third-Party-Financed Investment") shall be (provided that all
> Operations Capital contributed has previously been returned to the

---

[30] *Id.* § 3.2.

[31] *Id.* (emphasis omitted).

[32] *See id.* § 3.5.

[33] *Id.* § 3.5(a).  Section 3.5(b)(i) provides that "[w]hen one or more Members has contributed Operations Capital to the Company," distributions shall be made "among the Members in proportions to the percentage of Operations Capital contributed by each Member . . . until the Operations Capital contributed has been returned[.]" *Id.* § 3.5(b)(i).

[34] *Id.* at §§ 3.5(b)(ii)(A)-(B).

[35] *See id.* § 3.5(b)(ii)(C).

Members via distributions or other returns of capital pursuant to Section 3.5(b)(i)) distributed 50% to Gard and 50% to Priority.[36]

Section 3.5(c) is a catch-all, providing that "[a]ny distributions not addressed by the other provisions of this Agreement shall be made among the Members in such proportion as the Managing Members shall determine[.]"[37]

Beyond detailing PRF's organization, management, and cash flow, the PRF LLC Agreement imposes various restrictions on the Members.[38] Section 5.2(a) reads: "while [PPSF] is a Member of [PRF], [PPSF] will not directly or indirectly engage or assist others in engaging in any business or enterprise . . . that is competitive with [PRF's] business[.]"[39] Similarly, Section 5.2(b) states:

> while [PPSF] is a Member of [PRF] and for a period of two years after ceasing to be a Member for any reason, [PPSF] will not directly or indirectly . . . solicit, divert or take away . . . the business or patronage of any of the clients, customers or business partners of [PRF.][40]

In addition, Section 5.2(c) addresses "Confidentiality," providing that each Member "shall not divulge, disclose, or communicate any Confidential Information . . . to any Person, except to the extent such disclosure is necessary to the business of the Company[.]"[41] Furthermore, Section 5.2(d) prohibits each Member from "mak[ing]

---

[36] *Id.* The parties primarily included Section 3.5(b)(ii)(C) to account for Santander's investments in PPSF, which rolled over into PRF. *See, e.g.*, Tr. 518:13-22, 603:23-604:16, 617:12-22, 695:8-697:12.

[37] PRF LLC Agreement § 3.5(c).

[38] *See id.* Art. V.

[39] *Id.* § 5.2(a).

[40] *Id.* § 5.2(b).

[41] *Id.* § 5.2(c). Section 5.2(c) contains a lengthy definition of "Confidential Information," which generally relates to client data, internal operations, and proprietary information. *Id.*

8

any oral or written statement or other communication that disparages or places [PRF], or its principals, officers, directors, partners, managers, members, investors, products or services in a false or negative light[.]"[42]  Section 5.3 states the PRF LLC Agreement "may only be amended by a written instrument signed by all of the Members."[43]

## C.    PRF's Initial Successes and Gard's New Hedge Fund

PRF focused on pre-settlement fundings.[44]  Brett controlled marketing and underwriting[45] while Gard exercised his discretion to supply capital for PRF's operations through GFO.[46]  By the end of 2019 PRF had originated several million dollars in fundings.[47]  This success led PRF to consider possible expansion.[48]

Around this time, several investors in Gard's previous, successful hedge fund approached him about starting a new fund.[49]  They were, however, uninterested in investing in an operating company with liabilities, expenses, and unaudited financials like PRF.[50]  Instead, they would only invest in a regulated fund operated

---

[42] *Id.* § 5.2(d).

[43] *Id.* § 5.3.

[44] *See* Tr. 58:22-59:2.

[45] *See, e.g., id.* 55:10-57:4, 558:11-19.

[46] *See, e.g., id.* 558:3-9, 558:21-559:19.

[47] *See id.* 68:20-69:2; JX110.  GFO provided the capital to bankroll those fundings. *See* Tr. 68:20-69:2.

[48] *See, e.g., id.* 73:7-75:6.

[49] *See id.* 527:24-528:9 ("They were interested in investing in a fund managed by Casey Gard. They had been investors for many years in our previous hedge fund. It was a very successful investment for them . . . And that was who and what they were interested in investing in, a fund vehicle managed by Casey Gard.").

[50] *See id.* 527:5-20.

by Gard and his management firm, GFO Asset Management LLC ("GFOAM").[51] Gard, in turn, told Brett that he had been approached by his former investors and that he planned to start a new hedge fund to invest in litigation finance assets.[52] Therefore, Gard explained that he did not intend for GFO to make any further discretionary investments in PRF's fundings.[53]

Instead, Gard and Brett explored integrating PRF's existing business into the anticipated new hedge fund, with PRF then serving in an origination and servicing ("O&S") role.[54] They discussed a business model in which PRF would originate cases for Gard's new hedge fund to bankroll, and service those cases for O&S fees.[55] The pair agreed that transitioning PRF to an O&S business could (1) drive profitability;[56] (2) eliminate capital risk; (3) avoid conflicts of interest; and (4) increase scale.[57] Brett noted that personal injury settlements amount to billions of dollars annually, and the industry rule of thumb was to fund up to ten percent of case values.[58] As such, the

---

[51] *See, e.g.*, Tr. 527:24-528:24 (noting GFOAM is wholly owned by Gard and his spouse).

[52] *See id.* 529:10-530:14.

[53] *See id.* 533:4-534.

[54] *See id.* 529:10-533:3.

[55] *See id.* 530:6-14, 532:2-533:20, 613:13-615:6.

[56] *See id.* 530:15-532:1. Specifically, they discussed how PRF could earn tens of millions of dollars in revenues under a one-percent origination fee and one-percent annual servicing fee model, presuming the successful resolution of cases. *See, e.g., id.* 613:13-615:6. *See also* JX94 (noting the one-percent origination and one-percent annual servicing fee).

[57] *See, e.g., id.* 532:2-18 ("if we have a[] company that is originating investments and recommending them to the fund for investment [and also] investing [its] own capital in those fundings, then . . . [PRF] could be looked at as . . . cherry-picking investments."), 532:19-533:20 ("[B]y [PRF] not providing capital any longer for the fundings, we eliminate the capital risk, or the risk of [PRF] losing [its] capital."), 628:3-629:1.

[58] *See, e.g., id.* 530:15-531:7.

pair anticipated that a hedge-fund-backed PRF could potentially obtain enough market share to generate hundreds of millions of dollars' worth of funding originations.[59] Brett expressed excitement about the opportunity, and the two immediately began to implement the proposed transition.[60]

**D.  Gard Forms Fund I, PRF Transfers its Contracts, and Brett Invests**

In October 2019, Gard formed PRF Fund I, LP ("Fund I"),[61] with PRF Fund I GP, LLC ("Fund I GP") serving as Fund I's general partner and GFO as Fund I's "Initial Limited Partner."[62] GFOAM would serve as Fund I's investment manager.[63] Gard is Fund I GP's sole member.[64]

A few provisions of the Fund I LP Agreement are relevant here.  Section 1.03 states that Fund I "was organized to serve as a private investment fund through which the assets of its Partners may be invested primarily in litigation finance fundings[.]"[65]  To facilitate such investments, Section 2.02 provides for the admission of "Limited Partners."[66]  Section 6.01 details a "Management Fee" owed to GFOAM of

---

[59] *See, e.g., id.* 531:8-532:15, 532:19-533:1.

[60] *See id.* 534:18-535:19, 573:1-8.

[61] *See* JX338 ("Fund I LP Agreement") *See also* Tr. 670:22-671:8 (Gard testifying Fund I "is an evergreen structure," meaning "it's open-ended [] it will exist continually going forward.").

[62] Fund I LP Agreement; JX339 ("Fund I GP LLC Agreement").

[63] Section 3.01 of the Fund I LP Agreement provides that the "initial Investment Manager [of Fund I] shall be [GFOAM]." Fund I LP Agreement § 3.01.

[64] Fund I GP LLC Agreement at 1, 5.

[65] Fund I LP Agreement § 1.03.

[66] *Id.* § 2.02.

"approximately 2.0% annually[] of each Limited Partner's share of [Fund I's] Net Asset Value[.]"[67] Section 9.05 provides for a "Performance Allocation" as follows:

> [Fund I GP] shall have reallocated by credit to its Capital Account and debit to each Limited Partner's Capital Account at the close of each Fiscal Year . . . an amount equal to 20% of the net increase in Net Asset Value . . . attributable to each Limited Partner's Capital Account for such Fiscal Year[.][68]

With Fund I's governance structure in place, Brett and Gard began the next phase of their business reorganization.[69]

Starting in October 2019, PRF assigned all its existing fundings to Fund I.[70] Brett signed the assignment contracts on PRF's behalf, while Gard signed for Fund I.[71] Fund I paid PRF the then-current market value of the fundings.[72] After the assignments, Fund I (and later PRF Fund II, LP ("Fund II", together with Fund I, "Funds")) deployed all new fundings, not PRF.[73]

While transitioning the business, Brett and his brother Lloyd[74] invested $425,000 and $1.8 million, respectively, in Fund I and became Fund I limited partners.[75] In connection with their investment, Brett and Lloyd each received a

---

[67] *Id.* § 6.01.

[68] *Id.* § 9.05.

[69] *See generally* Tr. 573:1-8.

[70] *See* JX326 (example of an assignment contract); JX407 (same).

[71] *E.g.*, JX326; JX407; JX408.

[72] *See, e.g.*, JX407; Tr. 628:3-629:1 ("Fund I purchased those fundings at 100 percent of current fair value[.]"), 751:18-752:8 ("PRF Fund I paid the then-current market value of those fundings[.]").

[73] *See* Tr. 473:8-474:4, 726:3-7.

[74] At that point in time, Lloyd Findler was PRF's General Counsel. *E.g.*, *id.* 114:10-21.

[75] JX94; JX95; JX99; JX116; JX120.

12

Fund I private placement memorandum and other investment documents, including a prospective investor questionnaire. [76] Brett and Lloyd—each an attorney—reviewed the documents and discussed their contents before finalizing their investments. [77] The investment documents described Fund I's organizational structure, including Gard's control over Fund I GP and GFOAM, which directed Fund I's operations. [78] The documents also detailed GFOAM's two percent annual management fee, Fund I GP's twenty percent performance allocation, and PRF's O&S fees. [79] As Fund I limited partners, the Findlers each received monthly statements, which contained line items for all performance allocations and management fees. [80]

## E.     The Business After Fund I, the O&S Agreements, and Fund II

After Fund I's creation, Brett and Gard employed a shared-services model to effectuate their new business arrangement. [81] Under that model, PRF performed the intake for funding requests. [82] Brett conducted initial underwriting by reviewing the

---

[76] JX94; JX95; JX99; JX116; JX120.  While completing that questionnaire, in response to the question "Is the Subscriber an employee, officer or agent of, or in any way affiliated with the General Partner or [Fund I]?," Brett checked "Yes" and wrote:  "Employee of an affiliate in [PRF.]" JX116 at 20.

[77] *See* Tr. 379:18-380:8, 477:8-478:6.

[78] *See, e.g.*, JX94; JX95; Tr. 488:8-491:20 ("I knew that Casey was managing the funds . . . I knew that there were management fees that were deducted on the monthly statements for actual management of the fund.").

[79] *E.g.*, JX94; JX95.  PRF's O&S fees were payable if and when Fund I received payment equal to the funding amount after the underlying case resolved. JX94; JX95.

[80] JX549-578; *see* Tr. 478:9-479:15, 490:8-17.

[81] *See, e.g.*, Tr. 687:4-688:9.

[82] *See id.* 690:5-691:13.

13

request and intake information before deciding whether to approve a funding.[83] If

Brett approved, he passed the case to Gard who made the final decision on whether

to provide funding.[84] After Gard agreed to a funding opportunity, PRF memorialized

the funding arrangement in a contract.[85] PRF employees tracked case developments

on a recordkeeping system, Mighty.[86] Brett, Gard, Lloyd, and other employees

attended weekly meetings to discuss Mighty reports concerning borrower payoffs.[87]

Throughout this entire process the participants regularly shared confidential

information concerning the cases receiving funding and each entities' bookkeeping.[88]

In January 2022, with the enterprise functioning as described, Fund I and PRF

executed an Administration and Service Agreement to memorialize PRF's

---

[83] *See id.* 64:4-65:5.

[84] *See id.* 726:8-20.

[85] *See id.* 65:6-67:4. Specifically, PRF employees would insert case-specific information into template contracts and send them to Gard, who ensured they reflected the proper capital provider before negotiating the applicable fee arrangement. *See id.* 482:11-483:8; JX392 ("Prieto Dep. I") 31:1-18,43:19-44:8. The enterprise stored many of its template funding contracts on Mighty. *See* Prieto Dep I 41:2-11. Brett, Gard, and Lloyd decided when to update templates, including with respect to O&S fees. *See* Prieto Dep. I 31:1-32:5, 41:12-41:18. Once executed, contracts would circulate back to PRF, which would arrange for the wiring of funds. *See id.* 43:19-47:21.

[86] Tr. 66:6-67:4, 68:6-13. Such developments included the name of the funding provider, interest due, O&S fees due to PRF, and payoffs dates and amounts. *See* Prieto Dep. I 54:14-60:11. Brett and GFOAM both had access to Mighty. JX401 ("Prieto Dep. II") 24:10-25:14.

[87] *See, e.g.*, Tr. 226:10-19 ("[W]e had numerous meetings every week wherein we addressed the amount of fundings coming in, the closed cases, the recovery of principal, and the recovery of interest."), 423:7-424:4. Additionally, PRF employees regularly communicated with the Funds' bookkeeper regarding fundings and payoffs. Prieto Dep. I 195:19-199:4.

[88] *See, e.g.*, Tr. 423:2-424:18 ("Everything was commingled."); Dkt. 99 ("6/5/25 Post-Trial OA Tr.") 43:7-44:12 ("they were so commingled . . . . They were all in the same physical space using the same computer program. GFO used the same computer program as [PPSF], the same physical space, same computers.").

entitlement to O&S fees ("Fund I O&S Agreement").[89]  The Fund I O&S Agreement "appl[ied] to all fundings to date as well as future fundings" and would "remain in effect until . . . either party provides the other with thirty [] days written notice to terminate."[90]  The agreement states Fund I:

> provid[es] Non-Recourse and Recourse Funding to various [] [] entities [and] . . . desires [PRF] to perform all the administrative responsibilities associated with these fundings, including but not limited to tracking and vetting of funded investment, accounting of returns, etc.[91]

In exchange for those services, Fund I would "pay [PRF] an Origination Fee equal to One Percent . . . [and] a Servicing Fee equal to One Percent [] annually . . . of the 'Fundings[.]'"[92]  Consistent with prior agreements, the payments would "occur upon total satisfaction of each funded draw under any existing agreement."[93]

---

[89] JX155 ("Fund I O&S Fee Agreement").

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

A few months later, Gard formed a second limited partnership, Fund II,[94] to capitalize further on the enterprise's successful fundraising efforts.[95] As with Fund I, Gard formed PRF Fund II GP, LLC ("Fund II GP", together with Fund I GP, "Fund GPs") to serve as Fund II's general partner[96] and GFOAM would act as Fund II's investment manager.[97] Gard signed the Fund II GP operating agreement as Fund II GP's sole member.[98] The Fund II LP Agreement identified Gard as the "Initial Limited Partner."[99] Fund II and PRF also entered into an Administration and Service Agreement ("Fund II O&A Agreement" together with Fund I O&S Agreement, "O&S Agreements") to provide PRF O&S fees related to Fund II's fundings.[100] These agreements are materially identical to the mirror agreements concerning Fund I, except that they pertain to Fund II.

---

[94] *See* JX350 ("Fund II LP Agreement"); JX349 ("Fund II GP LLC Agreement"). From that point on, investor materials began including information for Fund II in addition to Fund I. *E.g.*, JX187; JX196; JX208; JX235. Fund II arose in connection with the enterprise's conversion of Fund I from a 3(c)(1) fund to a 3 (c)(7) fund. *See* Tr. 711:1-713:11. As a 3(c)(1), Fund I initially could solicit accredited with net assets of approximately $1.5 million, but was "limited to a hundred investors." *Id.* 711:19-712:6. By converting to a 3(c)(7) fund, Fund I could "have an unlimited number of investors," but participating accredited investors needed around "5 million [in] invested assets." *Id.* 712:12-24. Gard and Szep contemporaneously formed Fund II as a 3(c)(1) fund to capture prior investors in Fund I that did not meet the heightened qualification requirements. *See id.* 713:1-11.

[95] As fundings grew, select PRF employees switched over to GFOAM, including Paul Szep, who became a full-time employee of PRF in February 2022 and transitioned to GFOAM around April 2023. *See* Tr. 686:23-688:21.

[96] Fund II LP Agreement; Fund II GP LLC Agreement.

[97] Fund II LP Agreement § 3.01(a).

[98] Fund II GP LLC Agreement.

[99] Fund II LP Agreement.

[100] JX351. Brent signed for PRF, and Gard signed for Fund II. *See id.*

In connection with the business, PRF and the Findlers also provided input concerning the materials disseminated to actual and prospective Fund investors.[101] For example, Brett helped PRF employees prepare marketing decks which were updated monthly using information from Mighty and Gard.[102] PRF employees also made due diligence questionnaires for prospective investors.[103] Over time, these investor materials began to feature Fund-specific (rather than PRF) branding as the Funds' track record developed and became further removed from PPSF and PRF's original, pre-assignment fundings.[104] Additionally, Brett and Casey both met with prospective investors to discuss the enterprise's structure and operations.[105] Notably, one prospective investor's notes from meetings in early 2023 describe Brett as receiving a salary and being a Fund I investor, but do not mention Brett receiving any portion of management fees or performance allocations.[106]

---

[101] *See generally* Prieto Dep. I 113:2-117:10, 123:10-124:2.

[102] *See id.* 113:2-114:4, 123:10-136:9. The decks identified the enterprise's structure, including: the Funds as the funding vehicles; GFOAM as investment manager; Gard as manager of his various entities; PRF as the "Primary Originator, Underwriter and Servicer"; several key employes; and the various management, performance, and O&S fees. *See, e.g.*, JX196 (example of once such marketing deck).

[103] *E.g.*, JX201 (example of one such diligence questionnaire). As with the marketing decks, these questionnaires described the enterprise structure and fees. *Id.*

[104] *See* Tr. 737:23-744:2; *Compare* JX196 (emphasizing PRF), *with* JX208 (emphasizing the Funds).

[105] *See* JX595 41:4-42:10, 44:25-46:10; JX359; JX365.

[106] JX359; JX365; *see* JX595 41:4-43:11, 45:13-47:24.

**F. As Fundings Expand, Brett Requests Multiple Salary Increases**

By the end of 2022, PRF had started originating cases in California and Texas, and begun originating post-settlement and mass tort fundings.[107] PRF had generated seven-figure gross O&S fees.[108] And Gard's efforts caused the Funds and their limited partners' capital to grow considerably.[109] Although risks remained due to the nature of non-recourse funding, the venture appeared to be on the right track.[110] During this period, Brett and Gard maintained their close friendship.[111]

Recognizing the enterprise's success, Brett asked Gard for multiple increases in his PRF salary, in part to help Brett purchase a Miami Beach condo.[112] Gard eventually agreed to a $750,000 salary.[113] Yet, that was insufficient for Brett to purchase the condo.[114] Wanting to avoid a mortgage, Brett turned to Gard who suggested a "financing/monetization event" so Brett could "purchase the residence."[115] Gard proposed investing additional capital into Fund I on Brett's behalf to provide Brett a 10 year income stream.[116] Brett would then sell Gard his

---

[107] *See* Tr. 60:6-10, 117:14-17.

[108] JX189 at 4.

[109] *See, e.g., id.* at 5.

[110] *See, e.g.,* Tr. 125:23-128:13.

[111] *See id.* 291:15-292:1, 576:5-577:4.

[112] *See, e.g., id.* 148:17-150:1; JX464.

[113] *See* JX219 (Brett writing his "present $750k annual salary [] went into effect June and October 2022."); Tr. 335:7-9 (pointing out that $750,000 was the most Brett ever earned).

[114] *See* JX467; JX 468.

[115] JX467; *see* Tr. 543:23-546:3.

[116] JX467; *see* Tr. 543:23-546:3.

fifty percent stake in PRF and take a reduced salary.[117]  Brett balked at the proposal, stating he could not "mentally accept a reduction in Salary."[118]  Instead, Brett and Gard agreed to a $1.85 million bridge loan, memorialized in a January 30, 2023 Pledge Agreement.[119]  The Pledge Agreement provides that "to induce [GFO] to loan the $1.85 million to [Brett], [PPSF] is hereby granting [GFO] a pledge of a portion of its . . . Membership Interests" in PRF. [120]  In the Pledge Agreement, Brett acknowledged that he has no interest in "any current or future fund management related entities established or operated by [GFO], Casey Gard or any of their respective affiliates, and . . . has [no] objection with respect to same."[121]

## G.    PRF's Underwriting and Financial Position Deteriorates

By late 2023, PRF's originations started to plateau.[122]  Previously funded cases began to resolve, with several resulting in trial losses or settling for significantly less than conservative case value, leading to charge-offs and negative funding growth.[123] PRF was losing money, as its O&S business depended on the number of successful

---

[117] JX467; *see* Tr. 543:23-546:3.

[118] JX467; *see* Tr. 273:18-278:13.

[119] JX193.  Gard signed the Pledge Agreement for GFO, while Brett signed individually as "Borrower," and as President of PPSF. *Id.*

[120] *Id.*

[121] *Id.* § 2(i).  Brett testified that he "read [] and [] understood the terms" of the Pledge Agreement and the representation and warranty in Section 2(i) was "true when [he] signed it[.]" Tr. 285:20-286:11, 362:2-366:4. *But see id.* 366:19-21 ("As it relates to the specifics – I didn't read it as closely as perhaps I should have.").  Brett attempted to reconcile Section 2(i)'s text with his claim that he is entitled to money from the Funds by insisting at trial that he "didn't believe [the Pledge Agreement] had any ongoing effect . . . once it was paid back" or that it altered his rights under the PRF LLC Agreement. Tr. 366:2-368:21.

[122] *See, e.g., id.* 657:7-23.

[123] *See id.* 656:7-23; JX238.

case resolutions.[124] PRF's significant marketing budget began raising eyebrows at GFO, which bankrolled expenses.[125] It became clear that for PRF to become profitable, it needed to increase the number of originations, and originate cases with a greater likelihood of resolving favorably.[126] To tackle these concerns, GFO enhanced its scrutiny of PRF's underwriting.[127] That scrutiny revealed that PRF had not determined conservative case value for hundreds of intakes.[128] PRF's underwriting flaws also included insufficient vetting and due diligence.[129]

Amidst this backdrop Brett requested another salary increase, from $750,000 to $1 million.[130] Gard demurred pending improvement in PRF's performance, noting PRF's lack of profitability.[131] Brett countered by detailing his O&S responsibilities and purported success.[132] Brett also pointed out that Gard previously touted the Funds' success.[133] The two reached an impasse and Brett became "disillusioned."[134]

---

[124] *See* JX238; Tr. 153:6-16, 533:4-10.

[125] *See* Tr.708:12-710:23; JX289; JX371.

[126] *See, e.g.*, JX219; JX247 (Gard writing there is "a path towards profitability if [Brett] w[as] able to generate growth in the case originations and case payoffs.").

[127] Tr. 729:18-731:24.

[128] *See, e.g.*, *id.* 292:7-294:2.

[129] *See, e.g.*, Prieto Dep. I 284:2-287:5.

[130] JX219.

[131] *Id.*

[132] *Id.*

[133] *Id.* ("GFO owns both of the Funds which have produced near 20% Returns for the Investors. To that extent, anyone invested in the Fund, inclusive of you [sic] has done extremely well.").

[134] Tr. 150:6-151:10.

Matters grew worse in early 2024, when PRF and GFOAM employees had a series of meetings to discuss PRF's operating budget and underwriting in an effort to make the company profitable.[135] The meetings became contentious and less productive over time, as Brett took issue with critiques of his underwriting and downplayed negative data.[136] Brett engaged in disruptive behavior during the meetings to express his displeasure.[137]

Meanwhile, Brett continued to demand a salary increase to $1 million, again pointing out how much the Funds' investors were profiting.[138] Brett threatened that he would have to "re-evaluate [his] situation moving forward" if Gard would not agree to his request.[139] When Gard maintained his position,[140] Brett responded that his "[p]assion and desire moving forward is not the same."[141] Brett then proposed a "mutually agreeable pathway" for "[v]aluation" of his PRF ownership interest.[142] Gard suggested the two meet socially "to get this resolved."[143] Brett declined.[144] Instead, Brett gave Gard an ultimatum: agree to the salary increase or Brett would

---

[135] *See id.* 396:17-400:1, 730:12-731:24, 756:3-760:13.

[136] *See, e.g.*, Tr. 396:19-400:1, 500:8-552:20; Prieto Dep. I 284:2-285:23.

[137] *See* Tr. 550:13-551:7; Prieto Dep. I 285:12-23, 287:7-289:24.

[138] JX469.

[139] *Id.*

[140] *Id.*

[141] *Id.*

[142] *Id.*; *see* JX470.

[143] JX252.

[144] *Id.* ("don't know what more needs to be discussed").

"initiate the process for Valuation of PRF."[145]  Notably, none of the salary request communications indicate that Brett made his request because Gard refused to agree to PRF distributions.[146]

In May 2024, with PRF's performance still sputtering, Gard told Brett he could "no longer support a compensation draw for [him] at [PRF]," citing poor underwriting performance, misuse of the company credit card, and Brett's conversations with a PRF employee concerning Gard's management.[147]  Brett threatened to sue and "expose [Gard's] character and misdoings[.]"[148]  Brett also informed Gard that he would be limiting his work at PRF going forward.[149]

At this point, the parties discussed amending the PRF LLC Agreement for the first time.[150]  GFO, in consultation with Gard, proposed amending the PRF LLC Agreement to reflect PRF's transition to purely an O&S business for the Funds.[151] Brett rejected the proposed amendment.[152]

---

[145] *Id.*  Gard again expressed willingness to consider the salary request, provided PRF's performance improved. *Id.*  At the same time, Brett told Prieto that Gard was running the business into the ground, and she should look for a new job or retire. *See* Tr. 386:19-389:8.

[146] *See id.* 326:16-337:8, 339:3-341:1; JX464 (Brett requesting an increased salary without mentioning distributions); JX468 (same); JX469 (same).

[147] JX473.

[148] *Id.*

[149] *See id.*

[150] JX259. The push to amend the PRF LLC Agreement was driven, in part, by GFO's new counsel. *See* Tr. 604:18-605:5.

[151] *See* JX259 (largely gutting the provisions in Section 3.5(b)). S*ee also* Tr. 610:13-611:1 ("it . . . eliminated the need for the original distributions formulas . . . given that the company had transitioned to a purely originating, underwriting, and servicing company[.]").

[152] Tr. 613:7-9.

## H. The Business Today and This Action.

Since Brett and Gard's fallout in 2024, PRF has been largely inoperative.[153] In July 2024, the Funds gave PRF notice that they were terminating the O&S Agreements.[154] PRF has not performed O&S functions,[155] or taken any fundings.[156] GFO no longer pays PRF's operating expenses and canceled Brett's company credit card.[157] Brett has not been in PRF's office for over a year, and has not responded to PRF employees or potential-client inquiries.[158] Having internalized PRF's responsibilities, the Funds, GFO, Fund GPs, and GFOAM continue to operate. For his part, Gard has, since starting the Funds, generated millions of dollars in "performance fee[s]" through the enterprise's operation.[159]

On June 14, 2024, GFO filed an action in this Court for PRF's dissolution, winding-up, and appointment of a liquidation trustee.[160] Brett and PPSF countersued, alleging (1) GFO breached the PRF LLC Agreement; (2) GFO breached fiduciary duties owed to PPSF and PRF; (3) GFO and GFOAM tortiously interfered

---

[153] *See, e.g.*, 449:3-450:6 ("it was becoming impossible to work in that kind of environment[.]"); Prieto Dep. I 259:19-260:14, 265:1-12.

[154] JX287.

[155] . *See* Prieto Dep. I 258:8-18, 261:12-15, 265:4-12 ("now that we're not originating and servicing the funds.").

[156] *See, e.g.*, Tr. 170:15-172:14 ("no new cases were being approved."). *See, e.g.*, Prieto Dep. I 257:19-258:22.

[157] *See, e.g.*, Tr. 161:5-14, 552:21-553:10; JX473.

[158] *See, e.g.*, Prieto Dep. I 257:19-258:22, 347:17-348:23; Prieto Dep. II 32:7-33:16.

[159] Tr. 629:2-630:3.

[160] *See* Dkt. 1.

23

with Brent's business relationships; and (4) a constructive trust should be imposed.[161] The Court consolidated the cases and bifurcated the liability and damages phases.[162] On March 4-6, 2025, the Court held trial on the liability phase.[163] In June 2025, the Court heard post-trial oral argument.[164]

## II.    LEGAL ANALYSIS

The Court begins by evaluating Brett and PPSF's claims against GFO, GFOAM and the Funds. After resolving those claims the Court considers GFO's petition for PRF's statutory dissolution and winding up.

### A.    Brett and PPSF Have Not Proven Their Amorphous Claims by a Preponderance of the Evidence

Brett and PPSF's advance claims for (1) breach of fiduciary duty against GFO; (2) breach of the PRF LLC Agreement against GFO; (3) tortious interference against GFO and GFOAM; and (4) constructive trust against GFO, GFOAM, and the Funds.[165] Their post-trial briefing, however, omits much of that organizational structure and instead advances a mishmash of arguments, preceded by no statement of facts.[166] For post-trial briefing in particular, this is decidedly unhelpful. This sort of "pizza thrown at [the] wall" is "time-consuming to clean up" and makes placing

---

[161] *See* Dkt. 17.

[162] *See* Dkt. 15.

[163] *See generally* Tr.

[164] *See* 6/5/25 Post-Trial OA Tr.; Dkt 98 ("6/10/25 Post-Trial OA Tr.").

[165] *See* Dkt. 17.

[166] *See generally* Dkt. 91 ("Brett Opening Br.").

Brett and PPSF's assertions in a neat analytical framework unnecessarily difficult.[167] Nevertheless, the Court parses Brett and PPRF's arguments the best it can, starting with the fiduciary duty claims.

### 1. PPSF Did Not Prove GFO Breached Fiduciary Duties by a Preponderance of the Evidence

PPSF claims GFO breached fiduciary duties it owed to PRF as one of PRF's two managing members. Specifically, PPSF asserts GFO violated a duty to disclose relevant information concerning the enterprise and wrongfully usurped PRF's assets, opportunities, and relationships.[168] A breach of fiduciary duty claim "has only two formal elements: (i) the existence of a fiduciary duty that the defendant owes to the plaintiff and (ii) a breach of that duty."[169] Generally, a plaintiff bringing a breach of fiduciary duty claim must prove both elements by a preponderance of evidence.[170]

By default, "limited liability company managers owe fiduciary duties akin to those owed by directors of a corporation."[171] Although Delaware law permits LLCs to eliminate or modify fiduciary duties in their governing agreements,[172] the PRF LLC Agreement does not do so.[173] Thus, default fiduciary duties apply "as an

---

[167] *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 882 n.184 (Del. Ch.), *judgment entered sub nom. Auriga Cap. Corp. v. Gatz Props., LLC* (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del. 2012).

[168] *See* Brett Opening Br.at 4-28.

[169] *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 840-841, 859 (Del. Ch. 2022*), judgment entered sub nom. In re Metro Storage Int'l LLC v. Harron*, 2022 WL 2473354 (Del. Ch. July 5, 2022).

[170] *Id.* at 841, 859.

[171] *Mehra v. Teller*, 2021 WL 300352, at *28 (Del. Ch. Jan. 29, 2021) (citing 6 *Del. C.* § 18-1104).

[172] *See id.* (citing 6 Del. C. § 18-1101(e)).

[173] *See generally* PRF LLC Agreement.

equitable gap-filler."[174] Those duties are the duty of loyalty and the duty of care.[175] As explained below, the preponderance of the trial evidence does not support PPSF's fiduciary duty claim.

PPSF primarily argues GFO breached its fiduciary duty by usurping opportunities from PRF.[176] The corporate opportunity doctrine recognizes that a "fiduciary agrees to place the interests of the [entity] before his or her own in appropriate circumstances."[177] Under the doctrine, directors and officers "must avoid advantaging themselves at the corporation's expense [and] cannot compete with the corporation or divert corporate opportunities from it *without its consent*."[178] Thus,

> a corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity . . . the corporate fiduciary will [] be placed in a position inimitable to his duties to the corporation.[179]

---

[174] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662-63 (Del. Ch. 2012). Still, "principles of contract preempt fiduciary principles where the parties to a LLC have made their intentions to do so plain, and the Company may not saddle Defendants with common law fiduciary duties if doing so would contradict the plain language of the relevant LLC agreement." *Largo Legacy Grp., LLC v. Charles*, 2021 WL 2692426, at \*12-13 (Del. Ch. June 30, 2021) (cleaned up).

[175] *United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1049 (Del. 2021).

[176] *See* Brett Opening Br. at 13-20.

[177] *Broz v. Cellular Information Systems, Inc.*, 673 A.2d 148, 154 (Del. 1996).

[178] *Enhabit, Inc. v. Nautic Partners IX, L.P.*, 2024 WL 4929729, at \*1 (Del. Ch. Dec. 2, 2024) (emphasis added).

[179] *Broz*, 673 A.2d at 155.

Those factors, however, are only "guidelines to be considered" in the fact-intensive analysis and "[n]o one factor is dispositive."[180]  Notably, "[d]isclosure to and informed approval by the [entity] may insulate a director from liability where the corporate opportunity doctrine otherwise applies."[181]

PPSF did not address *any* of the *Broz* factors post-trial.  Instead, PPSF advances a smattering of arguments which, boiled down, challenge PRF's transition to an O&S company, which PPSF characterizes as GFO usurping PRF's fundings to Gard's benefit. [182]  A preponderance of the evidence does not support PPSF's usurpation of opportunities claim.

The weight of trial evidence shows Brett repeatedly acknowledged and assented in writing to PRF's transformation into an O&S company.[183]  Brett signed

---

[180] *SDF Funding LLC v. Fry*, 2022 WL 1511594, at *15-16 (Del. Ch. May 13, 2022); *see Metro Storage*, 275 A.3d at 852.

[181] *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 442 n.7 (Del. 1996); *see Grove v. Brown*, 2013 WL 4041495, at *8 & n.83 (Del. Ch. Aug. 8, 2013) ("may satisfy th[eir] burden by formally presenting the opportunity to the [entity] . . . and confirming the [entity's] disinterest.").

[182] *See* Brett Opening Br. at 13-20 ("Gard systematically embarked on a calculated strategy to push Plaintiffs out of the way so that he could retain all the funding business for his own personal benefit.").

[183] Brett's knowledge is imputed to PPSF, a limited liability company wholly owned by Brett who is the company's sole and managing member. *See, e.g.*, *B.A.S.S. Group, LLC v. Costal Supply Co., Inc.*, 2009 WL 1743730, at *6 (Del. Ch. June 19, 2009) ("the knowledge of an officer, director, or manager of a business entity generally is imputed to the entity."). Therefore, PPSF had knowledge of information disclosed to Brett. *In re American Intern. Group, Inc., Consol. Derivative Litigation*, 976 A.2d 872, 887 n.40 (Del. Ch. June 17, 2009) ("The general rule is well established that a corporation is charged with constructive knowledge of all material facts of which its officer or agent receives notice or acquires knowledge . . . even though the officer or agent does not communicate the knowledge to the corporation.").  Although PPSF and Brett do not meaningfully raise the PRF LLC Agreement's notice provision, it is in accord insofar as it directs notice for PPSF to Brett. PRF LLC Agreement § 5.5.

the agreements whereby PRF voluntarily[184] assigned its fundings to the Funds as part of the business transformation. [185] Additionally, Brett signed the O&S Agreements on PRF's behalf.[186] PRF's business transformation was also consistent with Brett and Gard's conversations from the outset of their business relationship.[187] The PRF LLC Agreement seemingly anticipated that change in that its terms only bind PPSF to non-compete and non-solicitation covenants. [188] As part of that transformation the parties shared confidential information as necessary to promote

---

[184] PRF's voluntary participation is obviously significant because one would generally expect that an entity's consent to and participation in a challenged activity should defeat a usurpation of opportunity claim. *See Enhabit* 2024 WL 4929729, at \*1 (holding a fiduciary "cannot compete with the corporation or divert corporate opportunities from it *without its consent.*") (emphasis added); *Triton Const. Co., Inc. v. Eastern Shore Elec. Services, Inc.*, 2009 WL 1387115, at \*11-14 (Del. Ch. May. 18, 2009).

[185] *E.g.*, JX326; JX407. Brett also acknowledged the business transition and his lack of interest in the Funds in the Pledge Agreement. *See* JX193 § 2(i). Additionally, Brett received extensive disclosures concerning the Funds' management and fee structure in connection with his investment in Fund I. *See* JX94; JX116. *See also* JX219 (recognizing "GFO owns the Funds[.]"); Tr. 379:18-380:8 (Brett testifying he reviewed those documents before finalizing his investments in Fund I). Further, as a Fund I limited partner, Brett received regular updates disclosing fees and performance allocations. *See* JX549-578.

[186] JX155; JX351. The O&S Agreements specify that the Funds, not PRF, "is in the business of providing Non-Recourse and Recourse Fundings[.]" JX155; JX351.

[187] Brett testified that he and Gard discussed the possibility of using a hedge fund to raise third-party capital to fund expansion from the beginning of their business relationship. Tr. 37:20-39:10, 42:23-43:8. Gard educated Brett on hedge funds, including how they operate and generate fees, as well as standard 20% performance allocation arrangements. *See* JX 15; Tr. 34:24-35:21, 318:10-318:20. Brett described the compensation arrangement as "like an 80/20 rule." Tr. 35:14-21. Brett's reference at trial to "80/20" as opposed to a more common phrase like "two and twenty" was a bit discordant at first, but it seemed ultimately consistent with Brett's focus on the performance allocation at trial.

[188] PRF LLC Agreement §§ 5.2(a)-(b). *See also Mehra*, 2021 WL 300352, at \*28 (holding parties to an LLC agreement can waive or modify applicable fiduciary duties); *Genworth Financial, Inc. v. AIG Specialty Insurance Company*, 2025 WL 688987, at \*9, n.124 (Del. Super. Feb. 21, 2025) (endorsing the meaningful variation canon (citing *City of Lewis v. Nepa*, 212 A.3d 270, 279, n.37 (Del. 2019))).

the enterprise's success.[189]  Moreover, Brett helped prepare materials for prospective investors that detailed the enterprise's revised structure.[190]  That Brett contemplated the challenged business transformation, signed numerous documents detailing PRF's shift to an O&S company, and helped facilitate restructuring the enterprise, severely undercuts PPSF's usurpation of opportunities claim.[191]

In response to this myriad of evidence indicating his voluntary participation in PRF's transition, Brett argues he did not fully understand the documents he signed and Gard "ma[de] misleading statements and withh[e]ld[] key information."[192]  That argument largely mirrors PPSF's purported duty of disclosure claim.[193] Specifically,

---

[189] *See, e.g.*, Tr. 64:4-68:20, 423:2-424:18; 6/5/25 Post-Trial OA Tr. 43:7-44:12.  PPSF argues "it is essentially black-letter law that a fiduciary's 'misuse of confidential information is inherently a breach of fiduciary duty.'" Brett Opening Br. at 17 (quoting *Metro Storage*, 275 A.3d at 858).  That legal truism does not save PPSF's fiduciary duty claim.  For one, the case PPSF cites for that proposition occurred in a factually distinct context – where a fiduciary of a publicly traded company stole confidential information and "jump[ed] ship," while the plaintiff entity went bankrupt. *Metro Storage*, 275 A.3d at 822-23.  Moreover, PPSF must show GFO *misused* PRF's confidential information to prove its claim.  For the reasons discussed below, the Court concludes the use of PRF's information to further the voluntarily transition to an O&S model is not misuse. *See Sorrento Therapeutics, Inc. v. Mack*, 2023 WL 5670689, at *24-25 & n.213 (Del. Ch. Sept. 1, 2023) ("The duty of loyalty also includes a duty to refrain from *improperly* using confidential information to advance the fiduciary's own personal interests, *rather than those of the corporation*." (emphasis added)).

[190] *See, e.g.*, 196; Tr. 113:2-114:4, 123:10-136:9.

[191] *See Renco Group, Inc. v. MacAndrews AMG Holdings LLC*, 2015 WL 394011, at *9 (Del. Ch. Jan 29, 2015) (holding a defendant did not wrongfully interfere with a corporation's business relationships where, as part of a "sophisticated business arrangement," the defendants acted in a way "contemplated" by his agreement with the company).

[192] Brett Opening Br. at 14-18.

[193] It is not clear that PPSF's attempt to assert a standalone disclosure claim jives with the case law and, in any event, is a poor fit here for a host of reasons.  As already discussed, disclosures can play a significant role in analyzing a usurpation claim. *See Grove*, 2013 WL 4041495, at *8, n. 83 ("The Delaware Supreme Court has recognized a 'safe harbor' for a director to pursue a corporate opportunity without breach of his fiduciary duty where the officer presents and opportunity to the board of directors and the corporation decides not to

29

PPSF asserts that GFO failed to disclose that (1) it used PRF as an "incubator" or "proof of concept" before starting the Funds, (2) after transitioning the business, PRF's only revenue would be O&S fees, and (3) Gard structured the enterprise to provide himself a profit.[194] Whether better understood as a purported form of disclosure claim or a response to the evidence that undermines the usurpation of opportunity claim, the weight of trial evidence does not support PPSF's information-based argument.

As discussed above, the evidence shows GFO did not withhold information concerning Gard's desire to start a hedge fund, PRF's post-transition business, and

---

pursue the opportunity." (citing *Broz*, 673 A.2d at 156)). Consistent with the rest of its arguments, however, PPSF's standalone duty of disclosure claim is difficult to follow. For starters, the duty arises situationally, such that its scope and requirements depend on context. *Stroud v. Grace*, 606 A.2d 75, 85 (Del. 1992); *see In re Mindbody, Inc., Stockholder Litigation*, 332 A.3d 349, 386 (Del. 2024) ("The duty of disclosure is not an independent duty by the application *in a specific context* of the [] fiduciary duties of care, good faith, and loyalty." (cleaned up) (emphasis added)). The majority of the caselaw PPSF cites concerns a significantly different context—namely, in which fiduciaries seek stockholder action. *See* Brett Opening Br. at 4-13 (citing *Mindbody*, 332 A.3d at 387; *Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 451 (Del. Ch. 2023); *City of Sarasota Firefighters' Pension Fund v. Inovalon Holdings, Inc.*, 319 A.3d 271, 292 (Del. 2024); *Firefighters' Pension Sys. of City of Kansas City v. Found. Bldg. Materials, Inc.*, 318 A.3d 1105, 1154 (Del. Ch. 2024)). There are well-established principles that govern that type of "recurring scenario[,]" which is not the scenario here. In addition, PPSF relied heavily on the decision in *Mills Acquisition Co. v. Macmillan, Inc.* during post-trial oral argument. 559 A.2d 1261 (Del. 1989). Yet, *Mills Acquisition* is also quite distinguishable. *Mills Acquisition* considered "a fraud upon the board" theory in connection with a broader fiduciary duty analysis when deciding whether to issue a preliminary injunction. *Id.* at 1265-78, 1283. The court held two directors' failure to disclose a "telephonic tip" that a third-party bidder was increasing its offer "was misleading and deceptive." *Id.* at 1282-84. That is all very different from this case, in which the weight of trial evidence shows Brett participated in PRF's O&S business for years without complaint after Gard informed him of the key terms of PRF's business transformation in conversations and numerous documents that Brett read and signed.

[194] Brett Opening Br. at 4-13; Dkt. 94 ("Brett Reply Br.") at 5-14.

the enterprise's structure and fees.[195] Although those documents do not explicitly mention Gard's alleged use of PRF as an "incubator fund,"[196] the trial testimony shows Brett and Gard discussed the possibility of eventually using a hedge fund to fuel the enterprise's expansion from the outset.[197] Gard disclosed his alleged plan to incorporate a hedge fund in PRF's business. That Brett knew or had access to the material information GFO allegedly withheld defeats PPSF's information-based claim.[198]

PPFS suggests that Gard had a fiduciary duty to affirmatively disclose the at-issue information and that including the relevant information in the various documents Brett signed, read, and created was insufficient.[199] That suggestion—which requires ignoring evidence pointing to extensive contemporaneous oral communications between Brett and Gard about the business transformation—is unconvincing. The case on which PPSF relies for that proposition occurred in a vastly

---

[195] Indeed, the trial testimony showed that when Gard's prior investors inquired about a potential new hedge fund, he disclosed the opportunity to Brett soon thereafter. *See, e.g.*, Tr. 529:10-530:14.

[196] *See* Tr. 684:1-685:5, 689:19-690:4, 727:3-18, 739:16-740:4. In making its "incubator" argument, PPSF relies almost exclusively on Paul Szep's testimony. *See* Brett Opening Br. at 7-9. Yet, Szep did not become involved with the enterprise until 2021, after the supposed incubation period ended. *See* Tr. 685:6-687:3. Thus, it is not clear that Szep has firsthand knowledge of Gard's initial intentions concerning PRF. Regardless, the weight of trial evidence does not show that GFO made any material non-disclosure concerning this point.

[197] *Id.* 37:20-39:10, 42:23-43:8, 530:6-14. *See also* JX15. Those plans are consistent with Brett and Gard's use of PRF's initial fundings as a "proof of concept" to develop a small-scale track record to evaluate whether the business was viable and to attract third-party investors in the eventual hedge fund. *See* Tr. 684:1-686:19; JX95.

[198] *See Presidio*, 251 A.3d at 289.

[199] *See* Brett Reply Br. at 19-22 (citing *McNeil v. Bennett*, 792 A.2d 190, 211-12 (Del. Ch. 2001), *aff'd in part, rev'd in part on other grounds, McNeil v. NcNeil*, 798 A.2d 503 (Del. 2002)).

31

different context, where a trust fiduciary took active steps to prevent a trust beneficiary from learning the true nature of the trust documents.[200] Conversely here, there is no evidence Gard did anything to obfuscate Brett's understanding of the myriad documents he read, signed, and helped create.

Similarly, Brett's testimony that he did not understand the at-issue documents because he is not financially experienced is not credible.[201] Brett is managing partner at a law firm and a business owner with decades of experience. Even if relevant here—which is debatable—Brett's attempt at trial to cloak himself in the aura of a financial rube lacks credibility. Additionally, documentary evidence often contradicted Brett's testimony.[202] Thus, the Court does not credit PPSF's argument that Brett lacked knowledge of the information presented in the numerous relevant documents discussed. Thus, the general rule that a party has notice of the terms of a document that the party read and signed controls.[203]

---

[200] *See McNeil*, 792 A.2d at 211-13 ("The evidence is clear that all the Siblings misunderstood the Family Trusts. The Lois Trustees contributed to this. Most egregiously, however, the Lois Trustees-through Brodhead-provided the Other Siblings with a letter that gave them an accurate portrayal of the terms of the Family Trusts, but excluded Henry from this communication. Brodhead's act was blatantly partial and improper.").

[201] *E.g.*, Tr. 142:8-19, 248:6-11 ("there's financial information in there that . . . I don't have the capacity to understand."). *See also Johnson v. Wagner*, 2003 WL 1870365, at *4 (Del. Ch. 2003) ("[A] trial court may determine the weight and credibility to be accorded any witness, and is responsible for resolving conflicts in the evidence.").

[202] For example, Brett testified he had "no knowledge" about any payment that PRF received in exchange for assigning its existing fundings to the Funds, even though Brett executed the assignment contracts on PRF's behalf. Tr. 267:10-20; *see, e.g.*, JX407.

[203] *See ETC Northeast Field Services, LLC v. Muse*, 2024 WL 2797337, at *6 (Del. Ch. May 31, 2024) ("Where a party has assented to clear contractual terms, that party is on notice of those terms." (citing Restatement (Second) of Contracts § 157 cmt. b (1981) ("Generally, one who assents to a writing is presumed to know its contents and cannot escape being bound by its terms . . . his assent is deemed to cover unknown as well as known terms."))). If anything,

Further dispelling PPSF's claim, the weight of trial evidence shows PRF's business transformation was not a one-sided transaction to Gard's advantage. Rather, PRF benefited by receiving current market value for fundings assigned to the Funds[204] and by the establishment of an overall enterprise that was able (1) to access third-party investment capital that was only available to Gard,[205] (2) mitigate its capital risk,[206] and (3) use investment capital to finance an expansion that resulted in PRF booking millions in O&S fees.[207] Thus, the evidence does not support a finding GFO wrongfully "use[d] [its] position of trust and confidence to further [Gard's] private interest" to PRF's detriment as PPSF suggests.[208] Instead, PRF was "actively engaged in the process" of undertaking the very actions it now challenges.[209] Accordingly, the Court concludes PPRF has not proven by a preponderance of the

---

the Court's impression of the trial evidence was that Brett was told and knew of all these things but was simply cavalier in his business dealings. So long as he had ongoing access to an ample salary and expense account and the potential for a significant payday on the O&S arrangement, Brett was satisfied to play the big-shot at legal conferences, with no expectation whatsoever that he would receive distributions out of the hedge fund management fees or performance allocation. Instead, things went off the rails when Gard declined Brett's request for another salary increase. Brett got mad. He saw the hedge fund business doing well and thought he should also benefit via a salary bump, despite the underwriting problems that compelled GFO to question Brett's performance.

[204] *See, e.g.*, JX407; Tr. 628:3-629:1 ("Fund I purchased those fundings at 100 percent of current fair value[.]"), 751:18-752:8 ("PRF Fund I paid the then-current market value of those fundings[.]").

[205] *See* Tr. 527:5-528:9 ("[T]hey were interested in investing in, a fund vehicle managed by Casey Gard.").

[206] *See id.* 532:19-533:20, 628:3-629:1 ("[T]hat purchase and sale transaction eliminated capital risk for us at [PRF].")

[207] *See, e.g.,* JX189 at 4.

[208] *Largo Legacy*, 2021 WL 2692426, at *12-18; *see* Brett Opening Br. at 13-20.

[209] *Broz*, 673 A.2d at 156.

evidence that GFO breached its fiduciary duties by usurping PRF's corporate opportunities or withholding material information.

## 2. PPSF Did Not Prove GFO Breached the PRF LLC Agreement

PPSF claims GFO breached multiple provisions of the PRF LLC Agreement.[210] To prevail on a breach of contract claim, the plaintiff must prove "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage" by a preponderance of the evidence.[211] Under Delaware's objective theory of contract, the Court "give[s] effect to the plain-meaning of the contract's [unambiguous] terms and provisions."[212] The Court "read[s] a contract as a whole and . . . give[s] each provision and term effect, so as not to render any part of the contract mere surplusage."[213]

As with its fiduciary duty claim, PPSF's briefing on its breach of contract claim advances a hodgepodge of unstructured arguments. In a series of one-line assertions in its brief, PPSF again challenges the restructuring of PRF's business, which it

---

[210] *See* Brett Opening Br. at 28-34.

[211] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

[212] *Terrell v. Kiromic Biopharma, Inc.*, 338 A.3d 1272, 1276 (Del. 2025) ("a contract's construction should be that which would be understood by an objective, reasonable third party."). That principle is especially important in the LLC context, given that limited liability companies "are creatures of contract[.]" *R & R Cap., LLC v. Buck & Doe Run Valley Farms, LLC*, 2008 WL 3846318, at *4 (Del. Ch. Aug. 19, 2008); *see id.* at *6 ("The LLC Act provides members with 'the broadest possible discretion in drafting their [LLC] agreements' and assures that 'once [members] exercise their contractual freedom in their [LLC] agreement, the [members] have a great deal of certainty that their [LLC] agreement will be enforced in accordance with its terms.'" (quoting *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999))).

[213] *In re Dissolution of T & S Hardwoods KD, LLC*, 2023 WL 334674, at *9 (Del. Ch. Jan. 20, 2023) (internal quotes omitted).

claims was done to benefit Gard, who also allegedly disparaged PPSF and Brett.
Unfortunately, PPSF's briefing on these points neither analyzes the limited
contractual text it references nor cites *any* trial evidence.[214] As such, PPSF's
arguments are insufficient to carry its post-trial burden. It is axiomatic that after
trial a plaintiff must support its claim with actual evidence, not conclusory
assertions.[215] This alone suggests rejecting PPSF's breach of contract claim.

The trial evidence confirms that suggestion. Recognizing the text's primacy in
any breach claim, the Court attempts to map PPSF's sparse arguments onto the PRF
LLC Agreement's text. Framed in that way, the weight of trial evidence shows PPSF
has not carried its burden of proving GFO breached the PRF LLC Agreement.
Because the Court concludes PPSF has not proven a breach of the PRF LLC
Agreement, it need not address the parties' arguments concerning whether there was
a valid amendment to the operating agreement.

### a. GFO Did Not Breach the PRF LLC Agreement by Not Making Distributions to PPSF and Brett

PPSF argues GFO breached the PRF LLC Agreement by not making any
distributions to Brett despite Gard profiting "somewhere north of [$]20 million . . . in

---

[214] *See* Brett Opening Br. at 28-34. PPSF instead devotes the bulk of its argument to attempting to refute GFO's contention that the parties implicitly modified the PRF LLC Agreement. *Id.* But that emphasis is misplaced because the Court need not reach oral modification to resolve PPSF's breach of contract claim.

[215] *E.g.*, *OptimisCorp v. Waite*, 2015 WL 5147038, at *70, n.568 (Del. Ch. Aug. 26, 2015) ("Because this is a post-trial opinion, Plaintiffs must prove what they allege and they supplied no evidence to support such speculation."); *In re Oracle Corporation Derivative Litigation*, 2023 WL 3408772, at *19 (Del. Ch. May 12, 2023) ("[M]ore than mere allegation is required post-trial.").

direct violation of the express 50/50 distribution provision in the PRF [LLC] Agreement."[216] PPSF's argument requires examining Section 3.5 of the PRF LLC Agreement.

Before doing so, it is worth noting that PPSF equates performance allocations and management fees that Gard obtained via the Fund GPs and GFOAM with "distributions" under the PRF LLC Agreement. But those are plainly not distributions by PRF. Section 3.5 of the PRF LLC Agreement governs distributions, which involve the transfer of "cash or property *from [PRF] to the Members*[.]"[217] Payments of Fund GPs' performance allocations and GFOAM's management fees were not payments by PRF.[218] And no evidence suggests PRF paid the performance allocations or management fees; indeed, the investment documents Brett received and helped create show the opposite.[219] The analysis could stop here. But even if the Court were to ignore that, PPSF's breach claim still fails because the plain terms of the PRF LLC Agreement show no distribution obligation was triggered.

PPSF asserts entitlement to distributions associated with loans originated by, or transferred to, the Funds. PPSF and Brett do not argue Sections 3.5(b)(ii)(A)-(B)

---

[216] Brett Opening Br. at 28 (internal quotes omitted).

[217] PRF LLC Agreement § 3.5(a) (emphasis added).

[218] *See In re Aearo Technologies LLC*, 346 A.3d 584, 596, *10 n.77 (Del. 2025) ("Delaware [] [] respect[s] the distinction of separate legal entities.").

[219] *E.g.*, JX94; JX196. That the allocations and fees came out of the Funds' limited partner investments and went to entirely different entities from PRF would be consistent with Gard's pre-transition discussions with Brett concerning how hedge funds operate and make money. *See, e.g.*, Tr. 34:24-35:21.

apply.[220]   That leaves Sections 3.5(b)(ii)(C)[221] and 3.5(c)[222] as possible textual-bases

for PPSF's distribution claim.  Both provisions pertain only to distributions related

to an "Investment."[223]   Section 3.2 defines "Investment" as "each Non-Recourse

Funding, Recourse Loan, or other investment *to be made by the Company*[.]"[224]  PRF

is the "Company."[225]   Accordingly, Sections 3.5(b)(ii)(C) and 3.5(c) only cover

distributions for loans made by PRF.  Yet, during the period when PRF allegedly

failed to make required distributions, the Funds, not PRF, were the source of all

fundings.[226]  Thus, PRF was not required to make any distributions under Sections

3.5(b)(ii)(C) and 3.5(c) during the at issue period.  The PRF LLC Agreement's text

therefore compels rejecting PPSF's distribution-based breach claim.

PPSF would have the Court essentially ignore Section 3.5(b)(ii)(C)'s reference

to "Investment" and focus instead on the provision's reference to "third party"

financed fundings.[227]  But the provision's express tie to the defined term "Investment"

---

[220] *See* 6/5/25 Post-Trial OA Tr. 20:8-21:8.

[221] *See id.* § 3.5(b)(ii)(C) ("Distributions related to any Investment as to which the capital for such investment is sourced entirely from a third party . . . shall be . . . distributed 50% to Gard and 50% to [PPSF].").

[222] *See id.* § 3.5(c) ("Any distributions not addressed by the other provisions of this Agreement shall be made among the Members in such proportion as the Managing Members shall determine when the Managing Members approve a related Investment, or as the Managing Members shall otherwise determine.").

[223] *See id.* §§ 3.5(b)-(c).

[224] *Id*. § 3.2 (emphasis added).

[225] *Id.* at Preamble.

[226] *See* Tr. 473:8-474:4, 726:3-7.  PPSF recognized this fact during post-trial oral argument. *See* 6/5/25 Post-Trial OA Tr. 24:2-26:11 ("[T]he mechanics of the money come through Fund I and Fund II.").

[227] *See id.* § 3.5(b)(ii)(C).

of course cannot be ignored. And, even so, the circumstances surrounding that section's inclusion again compel rejecting PPSF's argument. The weight of trial evidence shows that the parties included Section 3.5(b)(ii)(C) to address Santander's investment in PPSF, which rolled over into PRF.[228] Santander invested before PRF transitioned from funding cases directly to the O&S model described above. That context clarifies[229] that Section 3.5(b)(ii)(C) was not intended to broaden Section 3.5's reach beyond "Investments" made by PRF. Thus, once the parties transitioned PRF's business and assigned its existing fundings to Fund I, Section 3.5 became largely irrelevant.

This is not a situation in which GFO obtained distributions from PRF that PPSF did not, or in which a PRF distribution violated the allocation required by Section 3.5. Instead, the record shows that GFO and PPSF never unanimously agreed to cause PRF to make any "distributions." The record also shows that PPSF and Brett knew about the at-issue performance allocations, management fees, and profits, but did not raise the alleged distribution issue until after the parties' falling out.

At base, PPSF's argument asks the Court to (1) redefine the meaning of "distribution" to include payments by entities other than PRF; (2) broaden the term "Investment" by overlooking key qualifying language; (3) disregard corporate

---

[228] *See* Tr. 518:13-22, 603:23-604:17, 617:12-22, 695:8-697:11.

[229] *See Chicago Bridge & Iron Company N.V. v. Westinghouse Electric Company LLC*, 166 A.3d 912, 926-27 (Del. 2017) (holding a contract should be "read in full and situated in the commercial context between the parties. . . [because] [t]he basic business relationship between the parties must be understood to give sensible life to any contract.").

separateness; and (4) ignore Section 3.5's plain text as well as its drafting history. PPSF's arguments cannot be squared with the record or fundamental principles of Delaware corporate and contract law. PPSF's distribution-based breach of contract claim fails.

### b. PRF's Business Transition Did Not Breach the PRF LLC Agreement

PPSF argues that PRF's transition to an O&S model breached the PRF LLC Agreement.[230] Namely, PPSF challenges the transfer of fundings and diversion of profits from PRF to the Funds, which allegedly breached Sections 5.3 and 2.1(a) by modifying PRF's business purpose without a writing signed by all the Members.[231] Again, neither the PRF LLC Agreement's text nor the weight of post-trial facts support PPSF's position.

Under the PRF LLC Agreement's plain terms, the parties did not need a signed writing to transition PRF's business to an O&S model. True, Section 5.3 states the agreement "may only be amended by a written instrument signed by all of the Members."[232] Yet, Section 1.3 specifies that PRF's business purpose is "to engage in *any lawful business permitted under the Act*."[233] The operating agreement describes PRF's "initial plan" of issuing recourse and non-recourse litigation fundings only as an "*example, and not by way of limitation*," of lawful business activities PRF may

---

[230] Brett Opening Br. at 19, 28-29.

[231] *See id.*; Brett Reply Br. at 18-19, 28-29.

[232] PRF LLC Agreement § 5.3.

[233] *Id.* § 1.3 (emphasis added).

undertake.[234]  Because O&S services are undoubtedly "lawful business permitted under the Act," PRF did not need a "written instrument signed by all of the Members" to engage in that line of business.[235]

PPSF also asserts GFO breached Section 2.1(a) by altering PRF's business without written consent.[236]  Section 2.1(a) states in relevant part:

> [PRF] shall be managed under the direction of the Managing Members. . . . Gard and [PPSF]. . . . The Managing Members shall act by unanimous vote . . . unless and except only as may be specified otherwise in this Agreement or may be specified in a written action adopted by the Managing Members. . . . [T]he Managing Members may act through written consents."[237]

Again, PPSF advances a conclusory argument, citing no specific trial evidence.[238]  But even if PPSF had fleshed out its position, the weight of trial evidence does not support a finding that GFO breached Section 2.1(a).

As previously detailed, Brett and Gard, who wholly own and control PPSF and GFO respectively, voluntarily agreed to shift PRF's business as part of an eyes-wide-open transaction supported by a sound business rationale.  To effectuate that transition, the parties signed numerous writings, including (1) multiple contracts in which PRF, through Brett, agreed to assign its fundings to the Funds and (2) the O&S Agreements in which PRF, through Brett, endorsed the O&S model.[239]  PPSF does

---

[234] *Id.* (emphasis added).

[235] *Id.* §§ 1.3, 5.3.

[236] Brett Opening Br. at 19, 28-29.

[237] PRF LLC Agreement § 2.1(a).

[238] *In re Oracle*, 2023 WL 3408772, at *19 ("more than mere allegation is required post-trial.").

[239] *E.g.*, Fund I O&S Fee Agreement; JX326; JX351; JX407.

not address whether these documents constitute "written action[s] adopted by the Managing Members" or "written consents" under Section 2.1(a). Under the circumstances, one could conclude that the documents were sufficient, given that the assignment contracts and O&S Agreements are writings pertaining to PRF signed by the controller of each Managing Member. Of course, if that is the case, then PPSF's breach claim fails as GFO did not act contrary to Section 2.1(a)'s text.[240]

But even if the contracts discussed do not qualify as writings contemplated by Section 2.1(a), Brett's longstanding, voluntary participation in PRF's O&S business bars PPSF's Section 2.1(a) claim.[241] A party can forgo a contractual right by "remain[ing] inactive for a considerable period of time, [] [] recogniz[ing] the validity of the complained of act or [] act[ing] in a manner inconsistent with the subsequent repudiation" thus "lead[ing] the other party to believe the act has been approved."[242] That doctrine, known as "acquiescence," considers "defendant's knowledge of and reliance on the plaintiff's behavior (or lack thereof), and why the plaintiff must be adjudged complicit in the very breach for which [it] seeks damages."[243] Thus,

---

[240] *See PJT Holdings, LLC v. Costanzo*, 339 A.3d 1231, 1250 (Del. Ch. 2025) (noting a party breaches a contract when it "violate[s] a contractual provision[.]").

[241] The record is vanishingly sparse concerning what PPSF itself did after assigning its fundings to PRF. Instead, as is frankly the case throughout the relevant time, the trial evidence, to the extent it concerns Plaintiffs, focuses on Brett's knowledge and what he did or did not do. Of course, PPSF "is charged with constructive knowledge of all material facts of which its officer or agent [Brett] receive[d] notice of acquire[d] knowledge . . . even though the officer or agent d[id] not communicate the knowledge to [PPSF]." *In re American Intern.*, 976 A.2d at 887 n.40.

[242] *Julin v. Julin*, 787 A.2d 82, 84 (Del. 2001).

[243] *Lehman Brothers Holdings Inc. v. Spanish Broadcasting System, Inc.*, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014), *aff'd*, 105 A.3d 989 (Del. 2014).

acquiescence bars a breach of contract claim where the plaintiff knew its rights and "had the ability to challenge the breach at the time of the alleged wrongdoing," yet remained silent, causing the defendant to alter its position.[244]

Under that standard, the acquiescence doctrine bars PPSF's Section 2.1(a) breach claim. As a signatory to the PRF LLC Agreement, PPSF had knowledge of its rights under Section 2.1(a).[245] Similarly, PPSF's sole member Brett signed the assignment contracts and O&S Agreements on PRF's behalf.[246] Yet, neither PPSF nor Brett raised the alleged breach of Section 2.1(a) at the time. Beyond remaining silent, Brett actively helped facilitate the transition to a shared-services model in which PRF would originate and service cases for the Funds. As described above, that included (1) creating written materials to attract Fund investors, (2) participating in weekly meetings to discuss fundings, and (3) helping originate fundings for the Funds over the course of years.[247] In all that time, Brett never raised Section 2.1(a) until his falling out with Gard. At bottom, Brett's knowing participation in PRF's business transformation suggests he either approved the shift or acquiesced to the change. Either way, PPSF has not carried its burden in proving GFO breached Section 2.1(a),

---

[244] *Fotta v. Morgan*, 2016 WL 775032, at *9 (Del. Ch. Feb. 29, 2016) (citing *Klaassen v. Allegro Development Corp.*, 106 A.3d 1035, 1047 (Del. 2014)).

[245] *See* PRF LLC Agreement; *Sammons v. Andersen*, 968 A.2d 492 (Table) at *4 (Del. 2009) ("It is well settled in Delaware that a person is bound by the details of a document he signed even if he failed to inform himself of the details.").

[246] Fund I O&S Fee Agreement; JX155; JX326; JX351; JX407. Brett's knowledge of the details of the enterprise's reorganization is further evidenced by his review of Fund I investment documents detailing the O&S fees for PRF, performance allocations for Fund I GP, and management fees for GFOAM. *See* JX94; JX116; JX573; JX578.

[247] *See* Tr. 113:2-114:4, 123:10-136:9, 226:10-19; JX189 at 4; JX196.

especially given the contractual language discussed above and PPSF's non-engagement with the foregoing facts in post-trial briefing.

### c. PPSF Has Not Proven that GFO Misused Confidential Information or Disparaged PRF or Brett

PPSF also summarily argues that GFO breached the PRF LLC Agreement by misusing PRF's confidential information for Gard's own agenda and disparaging PRF and Brett.[248] The Court is not persuaded by PPSF's disparagement claim.[249] Section 5.2(d) prohibits PRF's members from making an "oral or written statement . . . that disparages . . . [PRF], or its . . . members."[250] Delaware courts have described disparaging remarks as those that "'speak of in a slighting or disrespectful way; belittle' . . . [or] a 'derogatory comparison of one thing with another[.]'"[251]

PPSF cites minimal evidence in support of its Section 5.2(d) claim and, critically, does not identify any specific allegedly disparaging remark.[252] The evidence PPSF does reference lacks any obviously disparaging remarks; instead they simply report the fact that the Funds, GFO, and GFOAM are no longer working with

---

[248] *See* Brett Opening Br. at 28.

[249] That PPSF advances a disparagement claim at all is a bit surprising given that prelitigation Brett threatened to sue and "expose [Gard's] character and misdoings. JX473.

[250] PRF LLC Agreement § 5.2(d).

[251] *E.g.*, *Virtual Business Enterprises, LLC v. Maryland Cas. Co.*, 2010 WL 1427409, at *6 (Del. Super. Apr. 9, 2010) (citations omitted).

[252] *See* Brett Reply Br. at 30-31 (citing JX237; JX292; JX310). In similar contexts, for example a defamation claim, PPSF's failure to identify a specific wrongful statement alone would compel rejecting its claim. *See McHahon v. McHahon*, 340 A.3d 543 (Table) at *3 n.18 (Del. 2025) (noting "a plaintiff must plead, as an element of a defamation claim, that the defendant made a specific defamatory statement." (internal quotes omitted)).

PRF and cite disappointing underwriting as the justification.[253] PPSF fails to explain how these routine statements updating stakeholders describe PRF in an actionably disrespectful or derogatory way or otherwise qualify as actionable disparaging remarks in these circumstances.[254] If anything, the weight of evidence shows PRF's underwriting performance had serious flaws that justified GFO's termination of the O&S relationship.[255] Given PPSF's sparse treatment of the issue, the Court concludes PPSF has not proven a disparaging statement sufficient to sustain its breach claim by a preponderance of the evidence.

PPSF's confidential-information breach claim is similarly unsupported by the facts. Section 5.2(c) provides that each Member "shall not . . . divulge, disclose, or communicate any Confidential Information . . . to any Person, except to the extent such disclosure is necessary to the business of [PRF]."[256] After PRF's business transition, Brett participated in the shared-services model in which staff shared

---

[253] *See* JX237 ("[W]e were pleased to add a seasoned trial attorney with significant experience in the personal injury and mass tort arenas as Head of Underwriting. We believe this should help improve our overall underwriting."); JX292 ("We have recently concluded that the improvement needed from the underwriting team . . . has not materialized after our continued evaluation of the underwriting outcomes. As a result, we sent a notice of termination to [PRF]."); JX 310 ("[PRF] has been terminated as of July 11, 2024[.]").

[254] It is worth noting that Gard attempted to resolve PRF's underwriting issues numerous times before terminating the O&S arrangement and informing stakeholders of the development. This would seem to cut against any intent to belittle or slight PRF. *See* Tr. 151:23-154:10, 396:17-400:1, 729:18-731:24. JX247; Prieto Dep. I 284:2-287:5.

[255] *See, e.g.*, Prieto Dep. I 284:2-287:5; Tr. 292:7-294:2, 729:18-731:24. *See also Orthopedic Associates of Southern Delaware, P.A. v. Pfaff*, 2017 WL 6570028, at *8 (Del. Super. Dec. 22, 2017) ("Black's Law Dictionary defines disparagement as a 'false and injurious statement that discredits or detracts from the reputation of another's character, property, product, or business.'" (quoting Black's Law Dictionary 215 (3d ed. 1996)); *Virtual Business Enterprises, LLC v. Maryland Cas. Co.*, 2010 WL 1427409, at *6 (Del. Super. Apr. 9, 2010) (similar).

[256] PRF LLC Agreement § 5.2(c).

information from PRF's intake records.[257] That included exchanging information regarding new funding matters as well as lawyers' and potential clients' identities.[258] The parties seemingly had to exchange this information to implement the post-transition business model successfully, with PRF originating fundings and passing them along to Gard and his entities for approval.[259] Thus, the weight of evidence suggests the information PPSF claims was improperly disclosed was "necessary to the business of [PRF]" and thus, if anything, fits within Section 5.2(c)'s express carve-out.[260] PPSF does not meaningfully engage with Section 5.2(c)'s text or explain why sharing the information described was not necessary to PRF's business. Therefore, the Court concludes that PPSF failed to show by a preponderance of evidence that GFO breached Section 5.2(c).

Accordingly, the Court concludes each of PPSF's breach of contract arguments is unsupported by the PRF LLC Agreement's text and the weight of trial evidence. At bottom, PPSF mounts various challenges to the same underlying conduct—PRF's transition from a funding provider to an O&S servicer for the Funds. As repeatedly described, PPSF and Brett agreed to that transition with full knowledge of the relevant facts and helped further the enterprise's restructuring *for years* without raising any breach claim. Faced with those facts, PPSF relies on a series of conclusory

---

[257] *See, e.g.*, Tr. 64:4-68:19, 687:18-688:9; Prieto Dep. I 54:14-60:11, 195:19-199:4; Prieto Dep. II 24:10-25:14.

[258] *Id.*

[259] *See id.* 64:4-65:21. As discussed, PPFS and Brett has good reason to agree to shift PRF's business.

[260] PRF LLC Agreement § 5.2(c).

arguments without addressing the contractual language or citing significant trial evidence. That is insufficient to carry PPSF's post-trial burden. Thus, PPSF's breach of contract claim fails.

### 3. Brett Has Not Shown by a Preponderance of the Evidence that GFO and GFOAM Interfered with His Business Relationships

Brett alleges GFO and GFOAM tortiously interfered with his business relationships by disparaging his abilities and undermining his relationships in communications with lawyers and customers as well as improperly poaching valuable business relationships.[261] A plaintiff asserting a tortious interference claim must prove (1) a reasonable probability of a business relationship, (2) defendant's intentional interference with that opportunity, (3) proximate causation, and (4) damages.[262] Rather than engage with any of these elements,[263] Brett lumps his tortious interference analysis together with PPSF's breach of fiduciary duty and misuse of confidential information arguments.[264] For the reasons already discussed, the weight of trial evidence supports neither argument.

Even if Brett discussed the tortious interference elements, his claim would still fail. To prevail on such a claim, the Plaintiff must "identify a specific party who was

---

[261] *See* Brett Opening Br. at 4 n.2; Brett Reply Br. at 29-31.

[262] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 886-87 (Del. Ch. 2009).

[263] Brett also does not address the fact that GFO is a party to the PRF LLC Agreement. *See* PRF LLC Agreement Among other things, it seems notable that Sections 5.2(a) and 5.2(b) of the operating agreement set forth non-compete and non-solicitation provisions, but by their express terms the provisions impose obligations only on PPSF, not GFO. *Id.* §§ 5.2(a)-(b).

[264] Brett Opening Br. at 4, n.2. Again, Brett's conclusory arguments do not carry his post-trial burden. *See, e.g.*, *Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *37 (Del. Ch. Mar. 9, 2022).

prepared to enter into a business relationship but was dissuaded from doing so by the defendants and cannot rely on generalized allegations of harm."[265] Although the plaintiff "need not name specific parties," it must point to a specific business opportunity with which the allegedly wrongful conduct interfered.[266] Here, Brett's collective briefing does not identify any specific transaction with which GFO or GFOAM interfered.[267] Instead, Brett challenges the alleged "self-dealing and usurping proprietary assets, opportunities, and relationships" generally.[268] That is insufficient to sustain a tortious interference with business relationship claim.[269] Additionally, Brett has not proven any supposed interference was "wrongful"[270] given his participation in (1) transferring fundings from PRF, (2) originating fundings for the Funds, and (3) sharing information between the enterprise's entities.[271] Thus, the Court finds Brett has not proven his tortious interference claim by a preponderance of the post-trial evidence.

---

[265] *Agilent Technologies, Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009) (internal quotes omitted).

[266] *You Map, Inc. v. Snap Inc.*, 2021 WL 106498, at *8-9 (D. Del. Jan 12, 2021) (citing *Agilent*, 2009 WL 119865, at *7).

[267] *See generally* Brett Opening Br.; Brett Reply Br.

[268] Brett Opening Br. at 4 n.2.

[269] *See Agilent*, 2009 WL 119865, at *7.

[270] *Id.* at *8 ("An alleged interference in a prospective business relationship is only actionable if it is wrongful." (citing Restatement (Second) of Torts § 767 cmt. c.)).

[271] *See, e.g.*, JX326; JX407; Tr. 64:4-68:19, 423:2-424:18; 6/5/25 Post-Trial OA Tr. 43:7-44:12.

#### 4. PPSF's Constructive Trust Claim Fails

In Count IV, PPSF brings a standalone claim for constructive trust.[272] But a constructive trust is a "remed[y]," not a "cause[] of action, and [] do[es] not provide an independent basis for recovery."[273] Although PPSF cites several cases where courts imposed a constructive trust as a remedy, it cites none where a plaintiff's request for a constructive trust provided a standalone claim.[274] For example, PPSF relies heavily on this Court's 2024 decision in *Enhabit, Inc. v. Nautic Partners IX, L.P.*[275] Yet, the *Enhabit* decision imposed a constructive trust as a remedy to facilitate the plaintiff's recovery, "[b]ecause [plaintiff] [] prevailed on its fiduciary duty and aiding and abetting claims."[276] Because Brett and PPSF's fiduciary duty, breach of contract, and tortious interference claims fail, they are not entitled to a constructive trust remedy. Thus, the Court rejects Count IV.

### B. The Trial Evidence Shows PRF Should Be Dissolved and Wound-Up

Having resolved Brett and PPSF's claims, the Court turns to GFO's petition for PRF's statutory dissolution and winding up, as well as its request for the

---

[272] Dkt. 17.

[273] *VGS, Inc. v. Castiel*, 2003 WL 723285, at *6 (Del. Ch. Feb. 28, 2003).

[274] *See* Brett Opening Br. at 20-23 (citing *Rende v. Rende*, 2023 WL 2180572, at *14 (Del. Ch. Feb. 23, 2023); *Prospect St. Energy, LLC v. Bhargava*, 2016 WL 446202, at *8 (Del. Super. Jan. 27, 2016); *Teachers' Ret. Sys. of Louisiana v. Aidinoff*, 900 A.2d 654, 658 (Del. Ch. 2006)). PPSF's reliance on cases like *Rende* is misplaced. True, the *Rende* court noted that "it is [] well established that any profit made through [a] breach of trust may be disgorged through the device of constructive trust." *Rende*, 2023 WL 2180572, at *14. But the court also held that imposing a constructive trust requires proving an underlying breach of fiduciary duties and "a non-speculative basis on which to quantify damages." *Id.* at *14-15.

[275] 2024 WL 4929729 (Del. Ch. Dec. 2, 2024); Brett Reply Br. at 31-35.

[276] *Enhabit*, 2024 WL 4929729, at *14.

appointment of a liquidation trustee. For the following reasons, the Court grants GFO's petition.

GFO seeks PRF's statutory dissolution.[277] This Court, "[o]n application by [] [] a member or manager . . . may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement."[278] Delaware law does not provide an exact blueprint for determining whether it is "not reasonably practicable" for an LLC to continue.[279] Notably, an LLC's business purpose need not be "completely frustrated" to meet this standard.[280] Instead, the Court considers if (1) the members' vote is deadlocked, (2) the operating agreement gives no means of resolving the deadlock, and (3) the company's financial condition shows there is effectively no business to operate.[281] None of these factors is dispositive or necessary for the Court to order dissolution.[282] Relevantly, "dissolution is warranted where the LLC's management has become so dysfunctional . . . that it is no longer practicable to operate the business[.]" [283] This Court has ordered dissolution where the petitioner

---

[277] *See* Dkt. 1.

[278] 6 *Del. C.* § 18-802.

[279] *See, e.g., Seokoh, Inc. v. Lard-PT, LLC*, 2021 WL 1197593, at *8 (Del. Ch. Mar. 30, 2021).

[280] *Fisk Ventures, LLC v. Segal*, 2009 WL 73957, at *4 (Del. Ch. Jan. 13, 2009), *aff'd*, 984 A.2d 124 (Del. 2009).

[281] *See, e.g.*, *id.*

[282] *See, e.g.*, *Seokoh*, 2021 WL 1197593, at *8.

[283] *Id.* (internal quotations omitted).

49

"demonstrated an indisputable deadlock between the two 50% members of the LLC."[284]

GFO asserts (1) PPSF and GFO are deadlocked, (2) the PRF LLC Agreement does not provide any means to resolve that deadlock, and (3) there is effectively no PRF business to operate.[285] Based on the weight of trial evidence, the Court agrees.[286]

The evidence shows PPSF and GFO are deadlocked. Since Brett and Gard's falling out, PPSF and GFO have stopped communicating. GFO has stopped funding PRF's operations, and GFO and the Funds have cancelled all their contracts with PRF.[287] Brett and PPSF do not dispute that a deadlock exists.[288] Instead, Brett argues the deadlock was "manufactured" by GFO and Gard as part of their "bad-faith conduct" to usurp PRF's business.[289] But that argument relies on the validity of Brett and PPSF's affirmative claims, which the Court has already rejected. Thus, the Court concludes GFO and PPSF are deadlocked with regards to PRF's management.

---

[284] *In re Dissolution of T & S Hardwoods*, 2023 WL 334674, at *7 (citing *Haley v. Talcott*, 864 A.2d 86, 88-89 (Del. Ch. Dec. 16, 2004)).

[285] Dkt. 92 at 58-65.

[286] Brett and PPSF's opposition to PRF's dissolution is somewhat surprising given that Brett repeatedly pushed Gard for a process by which his PRF interest would be valued and sold during his 2024 fallout with Gard. *See e.g.*, JX252.

[287] *See* Tr. 553:8-10; JX310.

[288] Brett Reply Br. at 42-46.

[289] *Id.* at 43-45 (citing *Vila v. BVWebTies LLC*, 2010 WL 3866098, at *7 (Del. Ch. Oct. 1, 2010); *Millien v. Popescu*, 2014 WL 656651, *2, n .17 (Del. Ch. Feb. 19, 2014); *Mehra*, 2021 WL 300352, at *18).

The PRF LLC Agreement provides no means of resolving that deadlock. The PRF LLC Agreement gives PRF's Managing Members, PPSF and GFO, the exclusive power to manage PRF's business affairs.[290] The PPSF and GFO can only act via unanimous consent.[291] The agreement contains no provision detailing what happens if the two 50% Managing Members are deadlocked, as is the case here.[292]

Finally, the evidence shows PRF has been largely inoperative and financially unstable since Brett and Gard's falling out in 2024. Since then, Brett has not (1) been in PRF's offices, (2) replied to PRF employee communication attempts, or (3) responded to attorney funding requests.[293] During the same period, (1) the Funds terminated the O&S agreements,[294] (2) PRF ceased its O&S functions,[295] and (3) Gard exercised his discretion to stop funding PRF's operating expenses.[296] No party disputes that Gard and GFO are permitted to cease funding PRF's operating expenses and that, without such funding, PRF operations are unviable. Moreover, according to Lloyd, Brett and Gard's personal conflict has made working at PRF "impossible."[297]

---

[290] PRF LLC Agreement § 2.1(a).

[291] *Id.*

[292] *See generally id.*

[293] *See, e.g.*, Prieto Dep. I 259:19-260:14, 261:1-9; Prieto Dep. II 32:7-33:16; JX473 (Brett writing to Gard that he "will be limiting [his] daily/evening work for PRF[.]"); JX292 (noting the termination of PRF's underwriting functions).

[294] *E.g.*, JX310.

[295] *See, e.g.*, Prieto Dep. I 257:19-258:22.

[296] *See, e.g.*, Tr. 553:8-10.

[297] Tr. 449:6-450:6; *see id.* 396:19-400:1.

Based on these facts, the Court holds that carrying on PRF's business is not reasonably practicable, and dissolution is warranted.

Having found dissolution proper, the Court must determine whether to wind up PRF and appoint a liquidation trustee. Section 18-803(a) of the Delaware Limited Liability Company Act provides that "the Court of Chancery, upon cause shown, may wind up the limited liability company's affairs upon application of any member or manager . . . and in connection therewith, may appoint a liquidating trustee."[298] Because "winding up logically follows dissolution in an entity's life cycle," the winding up analysis largely overlaps with the dissolution considerations discussed above.[299] Appointing a trustee to oversee liquidation is warranted when the petitioner demonstrates "the inability of members to agree how to wind up the company."[300] Brett and PPSF did not address GFO's request for winding up or appointment of a liquidation trustee in post-trial briefing or argument. Therefore, the Court concludes for the reasons discussed that GFO has shown good cause for winding up PRF and appointment of a liquidation trustee.

## III. CONCLUSION

For the foregoing reasons, judgment will be entered in favor of GFO, GFOAM, and the Funds and against PPSF and Brett consistent with this decision. The parties are instructed to meet and confer and, within ten business days, submit a proposed

---

[298] 6 *Del. C.* § 18-803(a).

[299] *Spellman v. Katz*, 2009 WL 418302, at *4 (Del. Ch. Feb. 6, 2009).

[300] *In re Coral Gables Luxury Holdings*, 2025 WL 1356027, at *5 (Del. Ch. May 9, 2025) (citations omitted).

form of implementing order identifying a Delaware attorney to serve as liquidating trustee for PRF or setting forth a process for the selection of a liquidating trustee.